**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

ANDRE TORKELSON,

          Plaintiff,

    v.

MY HOME TEAM LLC,

DENVER WEST REALTY GROUP, LLC d/b/a KELLER WILLIAMS ADVANTAGE, LLC,

         and

KELLER WILLIAMS REALTY, INC.

         Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff Andre Torkelson ("Plaintiff" or "Torkelson"), by and through his attorneys, HKM Employment Attorneys, LLP, for his Complaint against Defendants My Home Team LLC ("Home Team"), Denver West Realty Group, LLC d/b/a Keller Williams Advantage, LLC ("Advantage"), and Keller Williams Realty, Inc. ("Keller Williams") (collectively, "Defendants") states and alleges as follows:

**PRELIMINARY STATEMENT**

      1.     This is an employment discrimination case arising from Defendants' termination of Plaintiff because of his wife's life-threatening, disabling health conditions. After Plaintiff's wife became critically ill, Defendants repeatedly insisted that Plaintiff go on leave to take care of his

wife. However, when he did, Defendants treated Plaintiff disparately and punished him for manufactured absences because of Plaintiff's association with his wife, an individual with known disabling medical conditions requiring extensive treatment. Ultimately, Defendants terminated Plaintiff because of his association with his wife, in violation of the Americans with Disabilities Act and the Colorado Anti-Discrimination Act. In addition, the Defendants interfered with and retaliated against Plaintiff for using leave to take care of his wife, in violation of the Family and Medical Leave Act.

2.      Plaintiff began working for the Defendants as an Inside Sales Agent in or about July of 2017 and, later that year, he was promoted to Marketing Director.

3.      In or about May 2020, Plaintiff's wife, Danielle ("Dani") Torkelson fell ill with a respiratory illness and other serious medical ailments.

4.      Mrs. Torkelson underwent a series of hospitalizations and frequent testing to ascertain what was causing the worsening health issues.

## PARTIES

5.      Plaintiff was, at all times relevant to this Complaint, a resident of Colorado.

6.      Plaintiff is currently a resident of Minnesota.

7.      My Home Team LLC ("Home Team") is a Colorado limited liability company with a principal place of business at 165 South Union Boulevard, Suite 250, Lakewood, Colorado 80228.

8.      Denver West Realty Group, LLC d/b/a Keller Williams Advantage, LLC ("Advantage") is a Colorado limited liability company with a principal place of business at 350 Indiana Street, Suite #300, Golden, Colorado 80401.

9.      Keller Williams Realty, Inc. ("Keller Williams") is a Texas corporation with a principal place of business at 1221 S. Mopac Expressway, Suite 400, Austin, Texas 78746.

10.      Defendants are deemed a single employer of Plaintiff by virtue of their centralized control of employment practices, common management, common rules regarding management, interrelations of operations, and common ownership or financial control.  Defendants are therefore jointly and severally liable on all claims asserted in this action.

11.      "[T]wo entities may be considered 'joint employers' where they both exercise some control over the work or working conditions of the employee."  *Harbert v. Healthcare Services Group, Inc.*, 391 F.3d 1140, 1148 (10th Cir. 2004) (citing 29 C.F.R. § 825.106(b)).  Franchisees can be considered a joint employer of an operator's employees if the franchisee maintained "substantial control" over the workers' essential terms of employment.

12.      Defendants constitute a single and/or joint employer, as they have (i) common management; (ii) interrelation between operations; (iii) centralized control of labor relations; and (iv) degree of common ownership/financial control.  *See* 29 C.F.R. § 825.104.

13.      Defendants constitute as Plaintiff's employers because their employees acted directly and/or indirectly in the interest of an employer in relation to Plaintiff.  *See* 29 U.S.C. § 825.14.

14.      The following are a few, but not a complete list, of examples as to why Defendants constitute a single and/or joint employer and/or constitute as Plaintiff's employers:

a.   Upon information and belief, Keller Williams exercised substantial control over the essential terms of employment for the workers under the direct employment of Home Team and/or Advantage.

3

b.  Keller Williams is an international real estate company, founded in 1983, with more than 600 offices located across the U.S. and Canada.

c.  Keller Williams began franchising in 1991, and in 2006, became the fourth-largest U.S. residential real estate firm in North America.

d.  Keller Williams treats its associates as partners and "shares its knowledge, policy control, and company profits on a system-wide basis."

e.  Keller Williams provides a "curriculum through Keller Williams University" which "keeps our associates ahead of trends, tools and advancements in the real estate industry."

f.  Upon information and belief, Keller Williams helps interview franchisees' prospective employees, conducts background checks, trains the employees, and/or otherwise participates in the overall management of those employees.

g.  Upon information and belief, Defendants use the same employee handbook and/or Office Policy Manual.

h.  Defendants' employees attended weekly team meetings together.

i.  Defendants' employees attended weekly trainings together as a team.

j.  Defendants' employees attend "Keller Williams University" and other Keller Williams trainings.

k.  Defendants' employees, including Plaintiff, frequently went to events and conferences together.

l.  Upon information and belief, Defendants' employees went to Keller Williams' "Family Reunions" (i.e. company-wide conferences).

m. Defendants' employees used Keller Williams' "KW Command" system/platform for lead management, marketing automation, tracking leads through the sales pipeline/funnel, creating websites, setting up and running social media campaigns for their real estate business, and managing buy/sell transactions in coordination with Keller Williams' offices.

n. Upon information and belief, each of Home Team's buy/sell transactions go through a joint computer system that is reviewed by Advantage for any issues before the transaction is able to be finalized.

o. Upon information and belief, each of Home Team's buy/sell transactions must be approved by Advantage's office for compliance with Keller Williams' policies.

p. Home Team was founded in 2009 by Roxane Webster and Jake Gienger.  In 2012, Keith Alba joined Home Team as a third owner.

q. In addition to being an owner of Home Team, Mr. Alba is the employing broker for Advantage.

r. Mrs. Webster, Mr. Gienger, and Mr. Alba are each instructors for Keller Williams.

s. Upon information and belief, Mrs. Webster is a Keller Williams MAPS Coach, which is a company-wide coaching program.

t. Upon information and belief, Mr. Gienger is a Keller Williams BOLD Coach who travels nationwide teaching Keller Williams' employees and contractors BOLD courses.

u.  Home Team has a team of agents who live and work across the front range of Denver metro, as well as four administrative support staff.

v.  Home Team claims that it has 11 to 50 employees.

w.  Advantage has roughly 200 agents under its umbrella.

x.  On Home Team's LinkedIn webpage, it lists Advantage's office at 350 Indiana St., Suite 300, Golden, Colorado 80401 as its primary location.

y.  Mrs. Webster – who is an Owner of Home Team – has an email signature block which states: "My Home Team at Keller Williams Advantage."

z.  Karin Cumplido (Licensed Agent) has an email signature block which states: "My Home Team Keller Williams Advantage Realty."

aa. Keller Williams has a profit-sharing structure for Owners of offices, such as Advantage and/or Home Team's offices.  Upon information and belief, both Mrs. Webster and Mr. Alba participated in Keller Williams' profit-sharing program.

bb. Home Team's principals, Roxanne Webster, Keith Alba and Jake Gienger are all minority owners of Advantage.

15.     Because the Defendants' operations are so intertwined as addressed herein, the circumstances in this case justify disregard of the corporate entity.

16.     Under the integrated enterprise test, Defendants' lack of separateness warrants treating the Defendants as a single entity.

17.     At all times pertinent to the Complaint, the corporate business of Keller Williams, along with the business of Home Team and Advantage, were often so hazily confused that

employees of Defendants themselves did not know which was which.  Thus, the legal fiction of separate corporate entities must evaporate.  *See Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358 (10th Cir. 1974).

## JURISDICTION AND VENUE

18.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

19.    This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and the protections of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12112(b)(4).  This Court has jurisdiction over Plaintiff's state claim pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claim is so related to the federal claims that they form part of the same case or controversy.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

21.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

22.    Plaintiff filed his Charges of Discrimination, Numbers 32A-2021-00889, 32A-2021-00890, E2200013517, and E2200013518 with the Equal Employment Opportunity Commission ("EEOC") and Colorado Civil Rights Division for associational disability discrimination on September 21, 2021.  Plaintiff was issued a Determination in E2200013518 on March 31, 2022, and Plaintiff filed the present action within ninety (90) days of same.

23.     Plaintiff has subsequently received Notices of Right to Sue with respect to Charge

Numbers 32A-2021-00889, 32A-2021-00890, and E2200013517.

24.     Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

25.     Plaintiff incorporates by reference the above paragraphs as though set forth fully

and separately herein.

26.     Plaintiff began working for the Defendants in or about July of 2017.

27.     In or about November 2017, he was promoted to Marketing Director.

28.     In or about May 2020, Plaintiff's wife, Danielle ("Dani") Torkelson fell ill with a

respiratory illness and other serious medical ailments.  Mrs. Torkelson had underlying medical

conditions, which made the new symptoms particularly frightening.

29.     Mrs. Torkelson had been suffering from chronic health problems, including

systemic lupus erythematosus (an autoimmune disease in which the immune system attacks its

own tissues), postural orthostatic tachycardia syndrome (a condition in which a change from lying

to standing causes an abnormally large increase in heartbeat rate), and fibromyalgia (characterized

by chronic widespread pain).

30.     Because the primary new issues impacting Mrs. Torkelson in 2020 were in her

lungs, doctors began testing for COVID-19.

31.     Mrs. Torkelson underwent three COVID-19 tests, which all came back negative.

32.     Unfortunately, Mrs. Torkelson's oxygen level continued to be at only 77% of

normal capacity; she had significant chest pain; and she was unable to walk even half of a block

without feeling winded.

33.     Doctors were initially unable to find the cause.  With no immediate answers, Mrs. Torkelson was in and out of the hospital numerous times.

34.     During the same time, she developed what appeared to be an allergy that caused burning and redness in her hands and feet.  The burning was so severe that she frequently resorted to putting her hands in the freezer for temporary relief.

35.     Mrs. Torkelson is a university-trained jazz singer and, up until the time of her respiratory illness, was the lead singer in a band (as well as working as a bookkeeper).  Her medical conditions – leaving her breathless, fatigued, and weak – made her unable to sing or perform.

36.     Mrs. Torkelson fell into a deep depression that led to suicidal ideations, and ultimately, she attempted suicide on multiple occasions.

37.     Plaintiff informed Defendants that his wife had serious health conditions, which sometimes required his help.

38.     Defendants assured Plaintiff that his work hours were flexible and that they supported his need to help his wife.

39.     Plaintiff began working nights and weekends to keep up with his workload.

40.     When Mrs. Torkelson's condition worsened, her doctors referred her to the Mayo Clinic for treatment.   The doctors explained that without treatment from specialists, Mrs. Torkelson might die.

41.     On or about June 30, 2021, Plaintiff informed Roxane Webster (Owner) that he needed leave to care for his wife.

42.     Mrs. Webster responded (paraphrased): "Take as much time as you need.  Don't come back until you have answers.  We know how important this is for you."  She even added: "If you need to borrow money while you're gone, let me know.

43.     On or about July 6, 2021, Plaintiff and Mrs. Torkelson flew to Minnesota to see doctors at the Mayo Clinic in Rochester, Minnesota.

44.     On or about July 7, 2021, Plaintiff's wife began undergoing treatment at the Mayo Clinic, including but not limited to: over 50 blood tests, an MRI, CT scans, ultrasounds, sweat tests, and a fibromyalgia evaluation.  The couple went to a neurologist, rheumatologist, and a pulmonologist, among other specialists.  Given how critical Mrs. Torkelson's condition was, Plaintiff was responsible for transporting and caring for her.

45.     On or about July 7, 2021, while he was on pre-approved leave, Mrs. Webster called Plaintiff to ask him a number of questions about a listing.  The tasks in question had been assigned to another staff member (Kris Mendel) prior to Plaintiff's departure for the Mayo Clinic, and Defendants were aware that Plaintiff was out-of-state, on pre-approved leave helping his wife. Nonetheless, Mrs. Webster scolded Plaintiff and expressed frustration regarding alleged errors in the listing.  Despite being at the Clinic, Plaintiff worked with his coworkers to rectify the alleged issues as much as he could, and reminded Mrs. Webster that he was on leave to help care for his wife.  Ultimately, he had to end the phone call to attend a doctor's consultation with his wife.

46.     On or about July 8, 2021, Plaintiff spoke with Mrs. Webster to reiterate his need to focus on his ailing wife.  At that time, to aid Defendants, he gave Mrs. Webster access to his email and other passwords, so that others could cover while he fully focused on the necessary care for

his wife.  The Defendants informed Plaintiff that Ken (a Virtual Assistant) would handle many of Plaintiff's tasks while he was out.

47.     In that call, Mrs. Webster said (paraphrased): "I understand you need to completely focus on Dani.  Can you take a few minutes to talk with Ken about what you need covered?  I'll send an email out to the team and tell them to send any needed requests to you via email, so you can focus on taking care of Dani.  Just let us know if you have anything come up that we need to have someone take care of for you on this end."

48.     Following the call, Plaintiff had a Zoom meeting with the virtual assistant in which he explained his wife's condition, his leave, and taught the assistant to do simple tasks in Canva involving social media and other marketing needs for the Defendants.

49.     On or about July 11, 2021, Mrs. Webster and Plaintiff spoke again.  In this call, Mrs. Webster encouraged Plaintiff to "stay the course" and said he should stay with his wife until they had some answers, even if the process took a month or two.

50.     On or about July 14, 2021, Mrs. Webster text messaged Plaintiff to request information about a manual she believed he had.  Later, she texted: "Never mind, we figured it out."

51.     On or about July 16, 2021, Mrs. Webster called Plaintiff to check in – primarily, she seemed to be seeking information on Mrs. Torkelson's condition.  Nothing urgent about the Defendants' business was discussed.  After approximately 5 minutes, Mrs. Webster said she had to go to take another call.

52.     On or about July 19, 2021, Plaintiff called Mrs. Webster to check in and give her a full status update on his wife's condition.  He explained that his wife continued to suffer from a

multitude of symptoms; they were still seeking answers; and he was physically and mentally exhausted, as it was taking all he had to navigate the complexities of appointments, insurance issues, and meeting his wife's basic needs.  Again, Mrs. Webster said: "Stay the course.  Take as much time as you need.  It's so good you are there and packing years' worth of medical treatment into a short time."  Again, nothing urgent about Defendants' business was discussed and no alleged issues related to communication were brought up by Mrs. Webster.  After approximately 39 minutes, Mrs. Webster ended the call, saying that she had to go to take another call.

53.     Mrs. Webster also text messaged Plaintiff approximately four times between July 13 and July 20, 2021.  Each time, the issue was either resolved before Plaintiff was available to call Mrs. Webster, or Plaintiff called Mrs. Webster and they discussed the updates on Mrs. Torkelson's medical conditions.

54.     During the numerous calls and text messages between Mrs. Webster and Plaintiff, nothing was mentioned about the working relationship between them or any purported issues with Plaintiff's communication.

55.     Mrs. Webster went on a trip to Hawaii from on or about July 21, 2021 to July 29, 2021.  To Plaintiff's knowledge, during that period of time, Defendants made no effort to contact him.  Upon Mrs. Webster's return from vacation, she left Plaintiff a voicemail: "Hey you, it's me, just checking on ya."

56.     On or about July 29, 2021, Plaintiff and his wife – having received several new diagnoses, including: avascular necrosis (loss of blood supply to the bone), Raynaud's phenomenon (decreased blood flow to the fingers), vitamin D deficiency (which can cause fatigue, bone pain, muscle weakness, muscle aches, muscle cramps and mood changes, like depression),

central sensitization syndrome (in which the central nervous system amplifies sensory input across many organ systems), and erythromelalgia (a rare condition that causes a burning sensation in hands and feet), with a path forward to include more testing, and a prognosis of a long road to recovery – returned home from the Mayo clinic.

57.     On or about July 30, 2021, in the morning, Plaintiff sent a text message to Mrs. Webster explaining that he looked forward to talking with her later in the day regarding his return to work.

58.     In the afternoon on July 30, 2021, Mrs. Webster called Plaintiff and terminated him. At the time of his termination, Mrs. Webster explained that it was because of his wife's medical conditions and because of the time he had taken to care for her.  The leave Defendants used in an attempt to justify Plaintiff's termination had been to help his wife obtain medical treatment for her serious health conditions, and were pre-approved by the Defendants.

59.     Mrs. Webster stated that when Mrs. Torkelson's condition further improved, she would be happy to readdress working with Plaintiff.

60.     On or about August 2, 2021, Plaintiff had a follow-up conversation with Mrs. Webster.

61.     In this call, Mrs. Webster *again* said she would consider reinstating Plaintiff to the position she had just terminated him from after his wife's condition improved.  Part of the exchange went as follows:

        a.   Plaintiff: "I know that you mentioned, like, when she starts feeling better, um, maybe we could reapproach things – what does that look like for you guys?"

      b.   Mrs. Webster: "Um, I-I don't know.  Um, and I haven't spoken with Keith about it um, but, um, um, I'm always open to a discussion and see what your world is looking like at that point and what our world is looking like um, and, uh, in the meantime, I suspect you could, um, well, I'm sure you're looking into all this stuff, you could probably um, apply for unemployment – that would not fill the coffers but might allow you the flexibility to stay at home while you're going through this right now[.]"

      c.   Plaintiff again said: "Oh, with Dani's health stuff?"

62.    In this call, for the first time, Mrs. Webster suggested that Plaintiff's alleged lack of communication was an additional reason for his termination.  Further, Mrs. Webster added that – even though Plaintiff had clearly stated his need to be completely off of work to care for his wife, and despite Mrs. Webster's outward encouragement of same – Mrs. Webster said that she had expectations of Plaintiff during that time.

63.    Later, the Defendants emailed a third excuse for Plaintiff's termination, this time claiming that Plaintiff was terminated for purported performance issues.

**FIRST CLAIM FOR RELIEF**
**(Associational Discrimination in Violation of the Americans with Disabilities Act ("ADA"),**
**as amended, 42 U.S.C. § 12112(b)(4))**

64.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

65.    Defendants are and were, at all times pertinent to the Complaint, "employers" under the ADA.

66.     Plaintiff was, at all times pertinent to the Complaint, an "employee" under the ADA.

67.     Plaintiff was terminated for manufactured issues – such as purported communication issues – related to taking care of Plaintiff's wife, who had life-threatening and disabling medical conditions.  These manufactured reasons were given despite consistent outward encouragement from Mrs. Webster, who repeatedly said to "stay the course" and insisted Plaintiff stay with his wife until they "had some answers."

68.     Defendants repeatedly encouraged Plaintiff to take leave from work and, when Plaintiff took the leave he was encouraged to use, Defendants subjected Plaintiff to a discriminatory termination because of his association with a disabled person, in violation of 42 U.S.C. § 12112(b)(4).

69.     Defendants have therefore discriminated against Plaintiff in violation of the ADA by denying him equal terms and conditions of employment, including, but not limited to, terminating his employment because of his wife's disability.

70.     Defendants' above-described conduct constitutes malicious, willful and wanton violations of the ADA, for which Plaintiff is entitled to an award of punitive damages.

71.     As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

**SECOND CLAIM FOR RELIEF**
**(Associational Discrimination in Violation of the Colorado Anti-Discrimination Act**
**("CADA"), C.R.S. § 24-34-301 *et seq.*)**

72.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

73.     Defendants are and were, at all times pertinent to the Complaint, Plaintiff's "employers" under the CADA.

74.     Plaintiff was, at all times pertinent to the Complaint, an "employee" under the CADA.

75.     "The ADA and the CADA are parallel statutes," and "[w]henever possible, the CADA should be interpreted consistently with the ADA." *Unrein v. PHC-Fort Morgan, Inc.*, No. 17-CV-02846-REB-SKC, 2020 WL 2465719, at 1 (D. Colo. May 13, 2020) (citing *Tesmer v. Colorado High School. Activities Ass'n.*, 140 P.3d 249, 253 (Colo. App. 2006); *see also Mielnicki v. Wal-Mart Stores, Inc.*, No. 16-CV-01484-PAB-NYW, 2017 WL 6550872, at 3 (D. Colo. Oct. 10, 2017) (holding that the CADA is "substantially equivalent" to ADA, and whenever possible, the CADA should be interpreted consistently with the ADA); *Vaughn v. Safeway, Inc.*, No. 14-CV-01066-REB-NYW, 2015 WL 6873655, at 5 (D. Colo. Sept. 14, 2015), report and recommendation adopted*, No. 14-CV-01066-REB-NYW, 2015 WL 6861415 (D. Colo. Nov. 9, 2015) (same); see also 3 C.C.R. 708–1:60.1(A) ("The Law concerning handicap and/or disability is substantially equivalent to Federal law, as set forth in the Americans with Disabilities Act, as amended").

76.     When the U.S. District Court for the District of Colorado was recently called upon to decide whether the CADA supports associational claims in the analogous context of race

discrimination, the Court held that it did. *See Ostrom v. Mountain Top Ice Cream of Vail Ii, Inc.*, No. 19-CV-01005-MEH, 2020 WL 1852428, at 4 (D. Colo. Apr. 13, 2020).

77.     The Colorado Supreme Court recently recognized, CADA is "designed to implement the broad policy of eliminating intentional discriminatory or unfair employment practices." *Elder v. Williams*, 477 P.3d 694, 699 (Colo. 2020).  Further, CADA's "primary goal" is "eliminating employment discrimination in the workplace," and thus an interpretation that "excluded from CADA's reach a broad swath of workers" would be inappropriate. *Id.* at 702.

78.     Plaintiff was terminated for manufactured issues – such as purported communication issues – related to taking care of Plaintiff's wife, who had life-threatening and disabling medical conditions.  These manufactured reasons were given despite consistent outward encouragement from Mrs. Webster, who repeatedly said to "stay the course" and insisted Plaintiff stay with his wife until they "had some answers."

79.     Defendants repeatedly encouraged Plaintiff to take leave from work and, when Plaintiff took the leave he was encouraged to use, Defendants subjected Plaintiff to a discriminatory termination because of his association with a disabled person, his wife.

80.     Defendants have therefore discriminated against Plaintiff in violation of the CADA by denying him equal terms and conditions of employment, including, but not limited to, terminating his employment because of his wife's disability.

81.     Defendants' above-described conduct constitutes malicious, willful and wanton violations of the CADA, for which Plaintiff is entitled to an award of punitive damages.

82.     As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering,

embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

### THIRD CLAIM FOR RELIEF
**(Retaliation in Violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et seq.* Against Defendants)**

83.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

84.     Upon information and belief, Defendants are an employer within the meaning of 29 U.S.C. § 2611(4)(A), in that they have more than 50 employees within a 75-mile radius.

85.     Upon information and belief, Defendants are employers within the meaning of 29 U.S.C. § 2611(4)(A), in that they have more than 50 employees within a 75-mile radius.

86.     The term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(ii)(I).

87.     As "covered employers" under the FMLA, Defendants are required to offer any "eligible employee," as defined at 29 U.S.C. § 2611(2), up to 12 weeks of leave from work.

88.     The FMLA was enacted, in part, "to balance the demands of the workplace with the needs of families . . . [and] to entitle employees to take reasonable leave for medical reasons . . . [and] for the care of a child, spouse, or parent who has a serious health condition . . . in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b).

89.     Plaintiff availed himself of a protected right under the FMLA by informing the Defendants that he sought FMLA leave for his wife's serious health condition.

90.     Defendants took action that a reasonable employee would have found to be materially adverse when Defendants terminated Plaintiff shortly after he took leave.

91.     Defendants' violation of the FMLA was willful and without justification.

92.     Defendants' above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

93.     Plaintiff is entitled to damages equal to his lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendants and order the following relief as allowed by law:

A.     Actual economic damages, as established at trial;

B.     Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, and garden-variety emotional distress, pain, inconvenience, mental anguish, and humiliation;

C.     Punitive and/or liquidated damages, as permitted by law;

D.     Attorneys' fees and the costs of this action, as permitted by law;

E.     Statutory pre-judgment and post-judgment interest at the highest lawful rate; and

F.     Such further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.


Dated this 29th day of June 2022.

**HKM EMPLOYMENT ATTORNEYS LLP**


By: _s/ Jesse Fishman_

Claire E. Hunter
Jesse Fishman
HKM Employment Attorneys LLP
730 17th Street, Suite 750
Denver, Colorado 80202
chunter@hkm.com
jfishman@hkm.com
_Attorneys for Plaintiff, Andre Torkelson_